IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

| | |
|---|---|
| In re:<br><br>Encompass Enterprises LLC.<br><br>Debtor. | Case No. 26–11403 MCR<br><br>Chapter 11 |

# DISCLOSURE STATEMENT IN SUPPORT OF DEBTOR'S PLAN OF REORGANIZATION DATED OCTOBER 5, 2026

## IMPORTANT INFORMATION. PLEASE READ

Encompass Enterprises, LLC (the "Debtor" or "Encompass") is providing you with this Disclosure Statement ("Disclosure Statement) in connection with the Debtor's Plan of Reorganization ("Plan"). You are being served these papers as you are a creditor entitled to vote on the Plan or are otherwise a party in interest in this chapter 11 bankruptcy proceeding, pending in the United States Bankruptcy Court for the District of Maryland (the "Court").

The Debtor is soliciting your vote to accept the Plan.

The Disclosure Statement includes information about the Debtor, its business and financial affairs and the terms of the Plan. There is no assurance that the Court (the will confirm the Plan.

The Debtor believes the proposed treatment of creditors' claims in the Plan is the best result for creditors and recommends that all holders of Claims whose votes are being solicited, vote to accept the Plan.

**THE DEADLINE TO VOTE ON THE PLAN IS __________ __, 2026 AT 5:00 P.M. EASTERN TIME. FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY DEBTOR'S COUNSEL BEFORE THE VOTING DEADLINE. REVIEW THE VOTING INSTRUCTIONS PROVIDED IN THE DISCLOSURE STATEMENT AND THE BALLOT**

Some terms are defined and capitalized in the Disclosure Statement and the Plan. If a term is defined in the Disclosure Statement, that shall be its definition in the Plan unless the Plan contains a different definition.

Nothing in this Disclosure Statement may be relied upon or used by any person for any other purpose other than voting on the Debtor's Plan.

## DISCLAIMERS

Each Holder of a Claim entitled to vote should read this Disclosure Statement and the Plan before voting. The only permitted vote solicitation to accept or reject the Plan is under this Disclosure Statement. No one should rely on any information about the Debtor, its property or the Plan other than that information provided in this Disclosure Statement and in the Plan.

This Disclosure Statement summarizes certain provisions of the Plan. Though Debtor believes it contains accurate information, and has made every reasonable effort to provide adequate information about the Plan, the Disclosure Statement is not complete. If there are any inconsistencies between the Plan and the Disclosure

Statement, then the Plan shall control. Also, to the extent there are any inconsistencies between the plan projections (attached to this Disclosure Statement) and the Disclosure Statement and/or Plan, the projections shall control.

While this Disclosure Statement was prepared pursuant to §1125 of the U.S. Bankruptcy Code and Bankruptcy Rule 3016, it has not been prepared pursuant to other federal or state securities laws or other non-bankruptcy laws. Do not construe thus Disclosure Statement and the information provided herein as advice on any tax or securities issue or on any other legal effects of the reorganization on Holders of Claims. It has not been filed with the Securities and Exchange Commission or with any state authority. None of them have passed on the accuracy or adequacy of the Disclosure Statement or the Plan.

Holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.

The Debtor has made every reasonable effort to verify the accuracy of information presented herein. However, the Debor does not represent that the information is accurate. No independent auditor or accountant has reviewed the liquidation analysis or any of the financial reports attached to the Disclosure Statement.

The Debtor recommends that creditors vote to accept the Plan as it believes that creditors will realize a greater recovery under the Plan than under any other alternative. Plan confirmation is in the best interests of creditors.

## Table of Contents

I. INTRODUCTION 7

A. Disclaimer 7

B. Explanation of a Chapter 11 7

C. Purpose of this Document 8

D. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing 9

II. BACKGROUND 10

A. Description and History of the Debtor's Businesses Prepetition 10

B. Circumstances giving rise to the Chapter 11 Case 10

C. What the Debtor Has Done to Improve its Business Operations 11

D. Events During the Bankruptcy Chase 12

E. Insiders of the Debtor 13

F. Management of the Debtor During and After the Bankruptcy 13

G. Projected Recovery of Avoidable Transfers 13

H. Claim Objections 13

I. Litigation 13

J. Current and Historical Financial Condition 14

III. SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS 15

A. The Purpose of the Plan of Reorganization 15

B. Unclassified Claims 15

C. Priority Tax Claims 16

D. Treatment of Secured Creditors 17

E. Classes of Priority Unsecured Claims 19

F. Classes of General Unsecured Claims 19

G. Class of Insider General Unsecured Claims 20

H. Class of Equity Interest Holders 21

I. Means of Implementing the Plan 21

J. Risk Factors 21

K. Executory Contracts and Unexpired Leases 22

L. Tax Consequences of the Plan 22

M. Corporate Action 23

N. Effectuating Documents; Further Transactions 23

IV. CONFIRMATION REQUIREMENTS AND PROCEDURES 23

A. Who May Vote or Object 24

B. Votes Necessary to Confirm the Plan 25

C. Liquidation and Going Concern Sales Analysis 25

D. Feasibility 27

V. INJUNCTIONS 27

A. Injunctions Concerning the Debtor 27

B. Exculpation for Professionals of the Estate 28

C. Temporary Post-Confirmation Injunction Protecting Injunction Beneficiaries 28

VI. EFFECT OF CONFIRMATION OF THE PLAN 30

A. Discharge of the Debtor 30

B. Vesting and Authority to Initiate Adversary Actions and to Maintain Pending Adversary Actions 30

C. Modification of the Plan 31

D. Non-Severability Clause 31

E. Release of Liens 31

F. Retention of Jurisdiction 31

G. Conditions Precedent to Effective Date 32

H. Final Decree 32

VII. RECOMMENDATION 32

**NOTE: The Plan provides for various injunctions. They are discussed in the Plan and below in this Disclosure Statement.**

# I.

# INTRODUCTION [1]

Encompass Enterprises, LLC ("Encompass" or "Debtor") is the Debtor in this chapter 11 proceeding, currently pending before the United States Bankruptcy Court for the District of Maryland (the "Court"). This is Encompass' initial Disclosure Statement ("Disclosure Statement") filed in its chapter 11 case for consideration by the Court and creditors in this proceeding. The Disclosure Statement contains information about the Debtor and describes its proposed plan of reorganization ("Plan"). A copy of the Plan is attached as **Exhibit "A"**. Your rights may be affected. You should read the Plan and the Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one. You should also read the projection (attached as **Exhibit "B"**). If there are any inconsistencies between the Disclosure Statement and the Plan, the terms of the Plan shall control. If there are any inconsistencies between the Plan and the projection, the projection shall control.

The Debtor intends to remain in business and to pay monies to creditors. The proposed distributions are discussed below and in the Plan. Unsecured creditors are placed in their own class and will receive an estimated distribution of 15% of their allowed claim, to be distributed in monthly payments, over 4 and 1/2years. The proposed Plan provides the best chance of and greatest recovery to creditors than any other options, including closing the Debtor's business and liquidating its assets.

A. Disclaimer.

The financial data relied on in formulating the Plan is based on Encompass' internal financial information and constitutes its best estimations concerning its future performance. The information has not been audited or reviewed. The Debtor represents everything stated in the Disclosure Statement is true, to its best knowledge. The Court has not determined if the Plan is confirmable and makes no recommendation as to whether or not you should vote for or against the Plan.

B. Explanation of Chapter 11

The principal purpose of Chapter 11 is to reorganize a business. A debtor files a petition under chapter 11. This creates an estate which holds title to a debtor's legal and equitable ownership interests as well as some property acquired after a bankruptcy case is filed. A chapter 11 debtor operates its businesses as a "debtor in possession," unless

---

[1] All statutory references in the Disclosure Statement are to the Bankruptcy Code unless stated otherwise.

and until a court orders otherwise or appoints a trustee. Encompass is the debtor-in-possession in this bankruptcy proceeding, as no trustee has been appointed.

Filing a Chapter 11 petition creates an automatic stay which stops all attempts to collect pre-bankruptcy claims from the chapter 11 debtor or to interfere in a debtor's business operation. The automatic stay is complicated and there are exceptions and can be bases upon which the court determine that the stay should be lifted (terminated) or modified.

Reorganizing a business through a plan is why many chapter 11 cases are filed. Once confirmed by the Court, the chapter 11 plan becomes a new contract between a debtor and its creditors. A plan dictates how much and when a reorganized debtor will pay its obligations. Plans can liquidate (or sell) assets or plans can reorganize a business and change its legal obligations to creditors, as the Debtor proposes to do in this case. Plans may be both a reorganization and a sale. Encompass intends to remain in business, pay creditors a dividend and not liquidate its business or assets.

A disclosure statement is required to contain adequate information of a kind and in a sufficient detail to allow a hypothetical and reasonable investor to decide whether to support or oppose a plan. If a court approves a disclosure statement, it can then be sent to creditors for the purposes of soliciting the creditors' votes in favor of the proposed plan. Creditors have an opportunity to vote to accept or reject the plan and may also object to a plan for the reasons outlined in the Bankruptcy Code.

For a plan to be confirmed, it must satisfy §1129(a)'s requirements which include the following: (1) certain voting requirements; (2) the plan must be proposed in good faith; (3) the value being distributed to claimants must not be less than what unsecured creditors would receive in a liquidation; and (4) the plan must be feasible.

If a class of creditors is not being paid in full under the plan (so considered "impaired") votes to reject the plan, then § 1129(b)'s requirements must be met as to the rejecting class. These requirements are discussed below.

Once a plan is confirmed, a debtor is obligated to being performing under the plan, as of the "Effective Date," as defined in the plan. In this case, the Effective Date will be 30 days following entry of a final order confirming the Debtor's Plan. The Debtor will provide notice of the Effective Date.

C. Purpose of This Document.

This Disclosure Statement describes:

a) The Debtor and significant events during the case;

b) The treatment of Claims or Equity Interests;

c) Who can vote on and/or object to the Plan;

d) What the Court will consider when deciding whether to confirm the Plan;

e) Why the Debtor believes the Plan is feasible;

f) How Creditors' Claims will treated with a comparison to a liquidation; and

g) The effects of confirming the Plan.

The Disclosure Statement describes the Plan which establishes your legal rights.

COURT APPROVAL OF THIS DISCLOSURE STATEMENT IS NOT A DETERMINATION AS TO THE FEASIBILITY OR ADVISEABILITY OF PLAN OR WHETHER YOU SHOULD VOTE FOR OR AGAINST THE PLAN. CREDITORS SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND ALL EXHIBITS BEFORE DECIDING HOW TO VOTE.

D. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

Once the Court approves the Disclosure Statement as containing adequate information, then the Debtor will serve a solicitation package on creditors with the following: (1) this Disclosure Statement and Exhibits; (2) the proposed Plan; (3) a notice containing deadlines and instructions; (4) a ballot(s) for voting; and (5) a cover letter.

1. Time and Place of the Hearing to Consider Confirmation of the Plan.

The hearing to consider confirmation of the Debtor's proposed Plan is set for ______ __, 2026, at __:_0 _.m. in the U.S. Bankruptcy Court located at 6500 Cherrywood Lane, Greenbelt, Maryland 20770.

2. Deadline For Voting to Accept or Reject the Plan.

If you are entitled to vote to accept or reject the Plan, the Debtor will serve a ballot along with the Plan and Disclosure Statement on you. Your ballot must be completed and returned to the Debtor, so as to be received by the date and time set by the Court for it to be counted. See below regarding voting eligibility requirements. The deadline to receive a ballot is __ ____________, 2026 at 5 p.m. Eastern Time.

3. Deadline For Objecting to Confirmation of the Plan

Objections to confirmation of the Plan must be filed with the Court and served upon entities the Court identifies by __ ____________, 2026 at 5 p.m. Eastern Time.

4. Identity of Person to Contact for More Information

If you want legal advice concerning the Plan, contact your own attorney. Debtor's counsel will not give you legal advice or explain the Plan, beyond what is explained in the Disclosure Statement and the Plan. If you have procedural questions, you may contact Debtor's counsel as follows: Steven R. Fox, 15455 San Fernando Mission Blvd., Suite 400, Mission Hills, CA 91345; (818) 774-3545; srfox@foxlaw.com.

## II.

## BACKGROUND

A. Description and History of the Debtor's Businesses Prepetition

The Debtor is a Maryland entity located in Lusby, Maryland and formed in 2018. It does commercial and residential construction work. The Debtor obtains its work typically through competitive bidding and negotiated contracts.

B. Circumstances giving rise to the Chapter 11 case.

When the Debtor's business was begun, its principal, Eugene Benton, infused $175,000 from his 401(k) to fund the start of the business. He wanted to use a collaborative construction style and better integrate property owners into the building process, something he perceived was too often missing from construction work, especially in residential construction. The company's business operations include building custom new homes, elevating and moving structures to new locations and securing them to new foundations, renovating existing homes, and making various home improvements such as additions, kitchens bathrooms and full property gutting and remodels.

The Debtor also acts as a contractor for commercial construction projects, including building steel structures, performing commercial renovations, master planning for larger projects, design-build services, and property management.

The Debtor has installed and repaired garage doors, installed power awnings, handled smaller handyman projects, worked with customers to create creative surfaces for floors and walls, and performed some marine construction on docks. The Debtor's business rapidly grew. In its first year its gross revenues reached $168,000. Shortly thereafter in the following years the Debtor secured multiple renovation contracts valued at over $250,000 per contract. Encompass worked hard to establish its name and reputation in the industry.

Prior to filing bankruptcy, Encompass faced serious financial and business difficulties. They included the following:

Rapid growth, coupled with the 2020 Covid 19 pandemic, created significant challenges for the construction industry as a whole and specifically for the Debtor. The

pandemic disrupted supply chains, and severely increased material costs. As a result, project timelines were slowed. These problems created a severe strain on the Debtor's cash flow. To offset its cash flow problems, the company began to rely on new work and the initial deposits paid to continue operations and work on existing projects As time went on, funding the ongoing jobs became even more difficult. The company continued to win new contracts and work, but it began to lose control over project details and rising costs. The Debtor hired additional staff, but many were found to be less than adequately qualified, exacerbating the existing problems.

To finance new and ongoing projects, Encompass used Merchant Cash Advance ("MCA") loans. They are loans with huge upfront fees and extremely high interest rates. The Debtor expected that these loans would resolve its cash flow problems, but they quickly became a cycle, requiring additional loans to stay afloat. The MCA lenders routinely withdrew funds from directly from the company's bank accounts, making it challenging to cover payroll, payroll taxes, job costs, and overhead.

Encompass obtained MCA loans from eight different MCA lenders. The majority of these loans were repaid but some remained outstanding as of the petition date of this case.

The burden of the MCA loans further depleted cash on hand, strained operations and delayed jobs. This led to more customer dissatisfaction. In some cases, delays were also caused by property owners' inability to secure timely zoning changes or permits. These challenges had an immediate impact on the cash flow for the company.

Prepetition, Encompass had acquired a local garage door company and had opened the Encompass Door and Awning Division ("EDA"). EDA was run by its former owner. Over the next 3 years, the division faltered and failed. Following the failure and the prior owner's resignation, it became clear the division had not been well managed. Irregularities were discovered which created a substantial debt load. The Debtor closed this division to focus on its core construction business.

C. What Encompass Has Done To Improve Its Business Operations.

Encompass identified both the problems and potential solutions to stabilize its business and to reorganize. It believes it can reorganize for at least these reasons:

- Encompass has signed contracts for construction work are in the low millions of dollars that will take the Debtor into and through the winter of 2026-2027 and it is continuing to bid for more work.

- The company has cut expenses, including eliminating $9,000 per month in office and warehouse costs and $3,000 in utility costs.

- The Debtor refocused its social media spending.

- The company relinquished all vehicles on which there was secured debt, thereby substantially lowering operating expenses.

- The Debtor continues to look for areas to limit spending

- Staff has been reduced to only the most capable employees.

- Over time, the negative prepetition social media comments will fade from public attention.

- Encompass is much more selective as to which jobs it will bid on.

- Encompass has increased the margin on its bids.

- Encompass is exercising more control over its jobs to help improve cash flow and profitability.

- Scheduling jobs to fit Encompass' needs often can be difficult on jobs where the Debtor is acting as a sub-contractor. Encompass is taking the steps it can take to schedule jobs so that Encompass can work the jobs more efficiently and thereby increase net income.

D. Events During the Bankruptcy Case

Since commencing its chapter 11 case:

• The Debtor filed its bankruptcy schedules, statement of financial affairs and all other necessary papers

• The Debtor obtained approval to use cash collateral and extensions.

• The Court approved the Debtor motion to pay priority payroll.

• The Court approved employment of its professionals.

• The Debtor attended the meeting of creditors.

• The Debtor been faced with and responded to multiple motions for relief from stay. A homeowner sought relief to pursue a bond. The Court denied the motion. The Debtor did not oppose a motion to repossess a vehicle returned prepetition. The Court approved that motion.

• The Debtor rejected multiple construction contracts.

• A creditor brought a non-dischargeability action. The Debtor successfully moved to dismiss the lawsuit.

- The Court approved the Debtor's professionals interim fee applications.
- The Debtor prepared this Disclosure Statement and its proposed Plan.

E. Insiders and Affiliates of the Debtor

The Debtor's insiders are Eugene Benton, who operates the company and holds a 51% interest, and his spouse, Dawn Benton who, holds a 49% interest. Mrs. Benton provides services for the Debtor and was paid once during the bankruptcy case for this work. She will be employed by the Debtor post-confirmation to assist with miscellaneous tasks. There are no affiliates.

Mr. Benton will continue to operate the Debtor's business post-confirmation. Mr. and Mrs. Benton will acquire the equity in the Reorganized Debtor in the same percentages they held prepetition. Mr. Benton's salary following confirmation shall be $3,000 gross for each pay period with the Debtor paying payroll bi-weekly. This was Mr. Benton's salary during the bankruptcy case.

F. Management of the Debtor During and After the Bankruptcy

Both during and after the bankruptcy case, Mr. Benton will manage the Debtor's business.

G. Projected Recovery of Avoidable Transfers

In the year before the case began, monies were extremely limited. Spending was kept to a minimum. Mr. Benton kept his salary to a minimum. Suppliers were paid only as needed. Insurances were paid. Supplies for projects were purchased and used. Employees were paid. Given the small amounts of money that were paid, $20,000 or under in the aggregate per creditor, the Debtor does not intend to bring any actions to recover any pre-petition transfers. Not only are the sums small, insurers and suppliers would have valid defenses that they would likely assert.

H. Claims Objections

The Debtor reserves the right to object to claims to the fullest extent the Bankruptcy Code permits.

I. Litigation

The Debtor has not filed suits against any person or entity during the chapter 11 case. As discussed above, one homeowner filed a non-dischargeability suit against Encompass, which was dismissed.

Prior to the Debtor's bankruptcy filing, there were suits pending against the Debtor, including suits by MCAs for monies. All of these actions have been stayed.

Pursuant to 11 U.S.C. §1123(b), any causes of action that the Debtor may hold against any person or entity shall vest in the Reorganized Debtor as of the Effective Date. The Reorganized Debtor shall have the exclusive right and discretion to prosecute and/or settle any such causes of action, whenever arising. The Debtor shall also have the exclusive right and discretion to decline to bring any such causes of action. No one may rely on the fact that in the Plan or this Disclosure Statement that the failure to state a specific cause of action or claim is a sign the Debtor will or will not initiate a lawsuit.

The Debtor and/or Reorganized Debtor reserve all rights to prosecute any and all causes of action against any person or entity, unless released in the Plan. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to any cause of action on, after, or as a consequence of the confirmation of the Plan or the occurrence of the Effective Date.

J. Current and Historical Financial Condition

Attached to this Disclosure Statement are the following financial reports:

- Schedule B to the Debtor's chapter 11 Petition, which lists the Debtor's assets (**Exhibit "C"**)
- A P&L statement through August, 2026. (**Exhibit "D"**)
- A balance sheet as of August 31, 2026. (**Exhibit "E"**)
- A budget to actual comparison report. (**Exhibit "F"**)
- An accounts receivable report as of August 31, 2026. (**Exhibit "G"**)
- An accounts payable report as of August 31, 2026. (**Exhibit "H"**)

When the chapter 11 case began, Encompasses' financial position was poor. The financial reports reflect that over the period of the chapter 11 case, the Debtor has kept its expenses down, increased its gross revenues and generated a modest positive net income. During the case, its total receipts have increased significantly from the prepetition period. Receivables have been lowered due to extensive collection efforts. Costs of goods sold have been kept as low as reasonably possible. The Debtor has generated a net profit post-petition.

## III.

## SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

A. The Plan's Purpose.

The Plan places claims and equity interests in classes and describes the treatment each class will receive and identifies each class as impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount the Plan provides. **Exhibit "I"** is a listing of claims.

B. Unclassified Claims.

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and do not vote. They may, however, object to confirmation.

Administrative Claims

| Name | Amount Owed | Treatment |
|---|---|---|
| Ordinary Course of Business Expenses Arising Post-Petition. Normal operating expenses. | Est. payables of $50,000. Figure varies considerably. | Paid in full on the Effective Date of the Plan, or according to terms of obligation if later than the Effective Date, or by separate written agreement. |
| Fox Law Corporation – gen'l bankruptcy counsel | $40,000 (estimated) | Payment of $8,000 monthly in months 1 to 5. |
| Rogan Law – local bankruptcy counsel | $20,000 (estimated) | Payment at $4,000 monthly in months 1 to 5 |
| Lucove & Say, CPAs - accountants for Debtor | $10,000 (estimated) | Payment at $2,000 paid monthly in months 1 to 5 |
| Office of the U. S. Trustee - quarterly fee. | $1,193 | Paid in full on the Effective Date if owed at that time. Post-confirmation, the Debtor will pay the UST quarterly fee as it comes due in accordance with the applicable statute and until entry of a final decree. |
| Court Clerk's Fees | $500 (est.) | Paid in full on the Effective Date |
| | TOTAL | **$121,693** |

Except for ordinary course obligations, the Clerk's and the U.S. Trustee fees, the Court must rule on all fees listed above before any fees will be owed. Professionals must file and serve noticed fee applications and the Court must rule on them. The attached projection shows the Debtor's forecast that it will have sufficient cash on hand on the Effective Date to pay these claims from operations. The case will not close prior to payment of allowed administrative fees and expenses.

C. Priority Tax Claims.

Priority tax claims are unsecured income, employment, and other taxes described by §507(a)(8). Unless the holder of priority tax claim agrees otherwise, the holder must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the date of the order of relief, and any statutory interest.

The IRS' claim for unpaid payroll taxes is supported by prepetition recorded Notices of Federal Tax Liens ("FTLs"). They hold priority over prior recorded liens on the Debtor's assets. Once an FTL is filed, the IRS holds priority as to all property a taxpayer later acquires as against competing lienholders. 26 U.S.C. §§ 6322, 6323(a), (f); United States v. McDermott, 507 U.S. 447 at 453-55 (1993). Here prior recorded liens of MCAs, e.g. Fox Funding, Unique Funding Solutions, Parkview Advance, Specialty Capital, LLC and Peninsula Funding Group, to the extent they attached to any asset of the Debtor, no longer attach to any assets after the FTLs were recorded and the 45 day statutory period passed. At the 46th day, the IRS gained priority over all then existing liens.

The FTLs were recorded on various dates between August 1, 2024 and June 30, 2025. The 45 day period from August 1, 2024 ran in September, 2024. Between September, 2024 and the petition date in this case, the Debtor had collected all receivables that were owed before the 45 day period ran and the Debtor had spent all funds that it had possessed prior to the running of the 45 day FTL period. All liens of entities such as MCAs were wiped out.

Though the IRS claims are largely priority claims, due to the FTLs, the IRS claims are treated as secured claims but subject to Section 1129(a)(9)(C).

The following chart lists the Debtor's estimated §507(a)(8) priority tax claims and their proposed treatment under the Plan:

| Description | Amount Owed | Treatment |
|---|---|---|

| | | |
|---|---|---|
| Maryland Department of Labor<br><br>Unemployment taxes | $10,085.56<br><br>(No claim filed – scheduled amount.) | Based upon a priority amount due of $10,085.56, amortized at 6% interest. Payments are scheduled in months 6-49 to be paid in full within 60 months of the filing date with payments of $232.50/month. Total principal and interest paid under the plan is $11,545.46. |
| Internal Revenue Service<br><br>Payroll taxes | | Claim treated as secured. See below. |
| Office of the Comptroller<br><br>No proof of claim filed – payroll taxes | $ 118,856.22 | Based upon a priority amount due of $118,856.22, amortized at 6% interest. Payments are scheduled in months 1-49 to be paid in full within 60 months of the filing date at payments of $2,809.64/ month. Total principal and interest paid under the plan is $137,672.36. |

D. Secured Creditors.

These claims are secured by estate property.

The IRS claim based on its FTLs is addressed above in the section addressing priority tax claims. The FTLs are in first position for the reasons discussed above.

Claims other than the FTLs and purchase money interests (Veridian Credit union for a vehicle) are unsecured. Claims of MCAs (Fox Funding, Unique Funding Solutions, Parkview Advance, Specialty Capital, LLC and Peninsula Funding Group) are unsecured and are treated as unsecured creditors.

Star Capital Group, LP is listed in Schedule D as secured by a trailer. It was paid in full prepetition. It did not terminate its financing statement but has not filed a claim in this case. It does not receive any distribution under the Plan.

With respect to all secured claims:

1) Claims for post-petition default interest are waived. §§1123(a)(5)(G) and (b)(5) and 1124(2);

2) The payment amounts proposed to holders of Allowed Secured Claims include the estimated interest rate stated for each Class;

3) The payments proposed to the holders of these Claims shall be in full satisfaction of their Claims;

4) If a holder of an Allowed Secured Claim has a properly perfected lien (that the Debtor does not avoid), then such holder shall retain its lien(s) until the Debtor has satisfied its payment obligations under the Plan;

5) Upon payment of all monies required by the Plan to be paid on account of an Allowed Secured Claim, the holder of such Claim must promptly record a release of its security interest(s) in the Debtor's assets and that of any other person or entity that may be liable for the Allowed Secured Claim;

7) If payment on a secured claim has been accelerated, the acceleration is de-accelerated on entry of an order confirming the Plan.

8) Any contractual provision providing for allowance of attorneys fees and/or expense shall be nullified as of the Effective Date.

| Class | DESCRIPTION | IMPAIRED | TREATMENT |
|---|---|---|---|
| 1 | I.R.S.<br><br>Payroll taxes (FICA and FUTA) 2023-2026, Scheduled amount: various amounts in Schedules E and F. Proof of claim amount: 2nd Amended Proof of Claim asserts $338,648.03 as total debt.<br><br>(POC 14-2) | Impaired.<br><br>Entitled to vote. | Based upon a claim in the amount of $355,659.14. Payments are amortized at 7.25% interest and begin in month 1 and are paid off after 48 months at payments of $8,558.02/month. Total principal and interest paid in full during the plan is $410,784.96. |
| 2 | Veridian Credit Union<br><br>Security – 2016 Ford F-350 Scheduled claim $1,872.46. No claim filed. | Impaired.<br><br>Entitled to vote. | Based upon a secured claim in the amount of $1,945.85 paid in the first month of the plan. |

E. Classes of Priority Unsecured Claims

Certain priority claims referred to in Code §§ 507(a)(1), (4), (5), (6), and (7) must be placed in classes. The Code requires that each holder of such claims receive cash on the Effective Date equal to the allowed amount of such claims. However, a class of holders of such claims may vote to accept different treatment.

| | | | |
|---|---|---|---|
| 3 | Prepetition priority employee payroll claims not paid through the Debtor's payroll motion.. | Impaired.<br><br>Entitled to vote. | The Debtor owes payroll obligations to 7 employees totaling $39,189. The claims are amortized at 6% interest and are provided for in the Plan to be paid in monthly payments of $2,963.86 in months 3-18 of the plan. |

F. Classes of General Unsecured Claims

Claims in this class are unsecured claims and have no priority. The chart below identifies their proposed treatment.

| CLASS # | DESCRIPTION | IMPAIRED | TREATMENT |
|---|---|---|---|
| 3 | General unsecured claims:<br><br>Total scheduled amount: $1,505,334. (Sched. F)-Does not include unsecured MCA claims).<br><br>Total unsecured claims as reconciled:<br><br>$1,836,777 (Based on filed POC, scheduled amounts and reclassified portions of secured claims) | Impaired.<br><br>Entitled to vote. | Based upon unsecured claims of $1,428,997.42 plus additional claims of $438,780.73 which were filed as secured and reclassed to unsecured. The unsecured claims are paid at 10% over the 5-year plan. Monthly payments begin in month 7, and are reflected in the table below by month and by year.<br><br>•If any creditor in this class asserts a right to attorneys' fees and costs, it must, within 30 days following entry of the order confirming the Plan, either file a motion for allowance of fees and costs or must file a stipulation with the Debtor as to the amount of fees and costs. The failure to timely do so will result in the disallowance of any claim for attorneys' fees and costs through the Plan's Effective Date. In the circumstance where the Debtor and a creditor, post-confirmation, continue their business relationship which relies on a prepetition contract that has a provision for attorneys' fees and costs, such provision is annulled as of the Plan's Effective Date.<br><br>•For creditors whose payments in a given month would be less than $25.00, they shall be paid quarterly in the 3rd month of each quarter. |

G. Class of Insider General Unsecured Claims

Unsecured insider claims are unsecured claims not entitled to priority. §507(a).

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
| --- | --- | --- | --- |
| 4 | General insider unsecured claim: Dawn Benton<br>Scheduled claims at $52,847 & $30,000. No POC filed. | Yes.<br>Entitled to vote. | In month 60, Ms. Benton shall receive $1 on account of her insider claims. |

H. Class of Equity Interest Holders

Interest holders are parties who hold ownership interest in the Debtor. This chart below identifies the proposed treatment of this class of equity interest holders:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
| --- | --- | --- | --- |
| 5 | Equity Interest in the Debtor. | N/A | Mr. Benton shall act as the managing member. Mr. and Mrs. Benton shall acquire the entire equity interest in the Debtor (49% as to Mrs. Benton and 51% as to Mr. Benton) but only after they have contributed $25,000 in monies to the Debtor (payable in equal increments of $5,000 at months 6, 12, 18, 24 and 30. If unsecured creditors reject the Plan, the Bentons may propose to infuse additional new value monies or the Debtor may propose to auction the equity in the Debtor. |

I. Means of Implementing the Plan

1. Source of Monies

Payments and distributions under the Plan will be funded by the business operations.

2. Post-Confirmation Management

Mr. Benton will manage the Debtor's business.

J. Risk Factors

There are many risk factors, including the following (without limitation):

- Actual sales and revenues may be less than projected;
- The economy may shift into a depression;
- Supply chain issues may re-emerge; and
- Should an equity auction be required, a new owner may not have the necessary level of skill to properly operate the Debtor's business and make payments to creditors.

K. Executory Contracts and Unexpired Leases

As of the petition date, the Debtor had no executory contracts or unexpired leases except for its construction contracts. During the case, the Debtor moved to reject many contracts and the Court authorized the Debtor to reject them. The Debtor did so. Post-petition, the Debtor has completed work on other prepetition construction contracts. The Debtor presently has 4 construction contracts that are prepetition in nature. Three of them will be completed in fall, 2026. The fourth contract will be rejected.

The list which follows comprises all prepetition construction contracts whose performance has not yet been completed (and is not expected to be completed as of the Plan's Effective Date) and with the Debtor intends to assume as of the Effective Date:

There are no construction contracts to be assumed.

<u>Executory Contracts and Leases to be Rejected</u>.

During the bankruptcy case, the Debtor rejected a number of construction contracts. The following is a list of additional prepetition construction contracts the Debtor intends to reject:

- Diane & Stephen Sung, 600 Lake Drive, Lusby MD 20657, Home Improvement Contract dated July 29, 2025, for $223,500.
- Gary and Amy Ressing, 12190 Preston Dr., Lusby, MD 20657, Home Improvement Contract dated December 14, 2023, for $160,651.30.
- Clarice Waage, 12750 Tonkawa Trail, Lusby, 20657, Home Improvement Contract dated 7/13/2023

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to Plan confirmation. The Court will set a deadline for filing a Proof of Claim based on a Claim arising from the rejection of a lease or contract.

L. Tax Consequences of Plan

Creditors and equity interest holders concerned with how the Plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisors. The Debtor is a pass-through entity for tax purposes and it does not believe that confirmation of the Plan will have no impact on its own tax liabilities and tax attributes.

M. Corporate Action.

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified, without any requirement for further action by Holders of Claims or Interests, managers of the Debtor, the Reorganized Debtor, or any other Entity, including: (1) assumption of executory contracts and unexpired leases; (2) selection of the managing member for the Reorganized Debtor; and (3) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the company structure of the Reorganized Debtor and any company action required by the Debtor or Reorganized Debtor shall be deemed to have occurred on and shall be in effect as of the Effective Date without any requirement of further action by any person or entity.

On or prior to the Effective Date, the Debtor's manager shall be authorized and directed to issue, execute, and deliver those documents contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtor or the Reorganized Debtor. The authorizations and approvals contemplated by the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

N. Effectuating Documents; Further Transactions.

Prior to, on, and after the Effective Date, the Debtor and Reorganized Debtor and their manager are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to implement or further evidence the terms and provisions of the Plan, without the need for any approvals, authorizations, actions, or consents except for those expressly required under the Plan. All counterparties to any documents described in this paragraph are authorized to and may execute any such documents as may be required or provided by such documents without further order of the Court.

## IV.

## CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §1129(a) or (b). Section 1129(a) and (b) are complicated and have many requirements. You are encouraged to consult your own attorney to discuss these requirements.

A. Who May Vote or Object

Creditors holding claims may vote to accept or to reject the Plan. Some parties in interest, however, are not entitled to vote to accept or reject the Plan. A Creditor or Equity Holder has a right to vote for or against the Plan only if that person has a Claim or Equity Interest that is both (1) allowed or allowed for voting purposes and (2) impaired. The Debtor believes all classes are impaired and that members of each class are entitled to vote to accept or reject the Plan.

A party in interest may object to confirmation if the party believes that confirmation requirements have not been satisfied.

1. What Is an Allowed Claim or an Allowed Equity Interest?

Only a Creditor or Equity Interest Holder with an Allowed Claim or an Allowed Equity Interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim in its Schedules, unless the claim was scheduled as disputed, contingent, or unliquidated, or (2) the Creditor has filed a proof of claim or Equity Interest, unless an objection has been filed to such proof of claim or Equity Interest.

2. What Is an Impaired Claim or Impaired Equity Interest?

A class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

3. Who is Not Entitled to Vote

The holders of the following types of Claims and Equity Interests do not vote: holders of Claims and Equity Interests that have been disallowed by an order of the Court; holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been allowed for voting purposes; holders of Claims or Equity Interests in unimpaired classes; holders of Claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; holders of Claims or Equity Interests in classes that do not receive or retain any value under the Plan; and administrative expenses. An entity not entitled to vote on the Plan, may have a right to object to the Plan.

4. Who Can Vote in More Than One Class

A creditor whose Claim is allowed as both secured and unsecured Claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject the Plan in each capacity and may a ballot for each claim.

B. Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders or (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes.

1. Votes Necessary for a Class to Accept the Plan

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (½) of the allowed claims in the class, who vote, cast their votes to accept the Plan and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

2. Treatment of Non-accepting Classes

Even if one or more impaired classes vote to reject the Plan, the Court may confirm the Plan if the non-accepting classes are treated in the manner provided by Bankruptcy Code. See §1129(b). A plan that binds non-accepting classes is referred to as a "cramdown" plan. The Code allows a plan to bind non-accepting classes of claims or equity interests if a plan meets all requirements for consensual confirmation except the voting requirements of §1129(a)(8), does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that voted to reject the plan. Consult your attorney to learn if a "cramdown" confirmation will affect your claim or equity interest.

C. Liquidation and Going Concern Sales Analysis

1. Liquidation Analysis

To confirm the Plan, the Court must find that creditor classes and equity interest holders who do not accept the Plan will receive at least as much under the Plan as they would receive in a chapter 7 liquidation.

Under §1129(a)(7), each holder of a Claim or Interest in an impaired class must either (I) vote to accept the Plan or (ii) receive or retain under the Plan cash or property of a value, as of a plan's Effective Date, that is not less than the value such holder would

receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. In a Chapter 7 case, a trustee would liquidate the Debtor's assets and distribute monies to creditors based on the Code's priority scheme. Under that scheme, Secured Creditors are paid from the proceeds of sale of assets securing their liens. If any value remains after superior secured claims are satisfied, then holders of administrative claims are generally the next to receive payments followed by priority claimants such as certain taxes and trust fund payments. Unsecured Claimants are then paid from any remaining proceeds. Finally, Interest Holders receive the balance that remains, if any, after all creditors are paid. To confirm the Plan, the Court must find that all creditors and interest holders that do not accept the Plan will receive at least as much under the Plan as they would receive under a hypothetical Chapter 7 liquidation of the Debtor.

The Debtor believes this requirement is met because (1) all of its asset value is subject to the recorded FTLs and there would be no distribution to unsecured creditors in the event of a liquidation. See the liquidation analysis (**Exhibit "J"**)

The only significant asset available for unsecured creditors in a liquidation could be recoveries from avoidance actions but the Debtor does not believe there are any.

The liquidation analysis is an estimate. It shows that for Unsecured Creditors, the best prospect to recover money is greater under this Plan then in a liquidation where they would receive no monies.

2. Valuation of the Debtor as a Going Concern

Valuation of an ongoing business is a complex matter. A going concern valuation draws on the Debtor's cash flow projection for the life of the Plan, essentially income capitalization (incorporating anticipated future profits). Typically, a valuation will consider cash flow and impose a multiplier on it, essentially, an arbitrarily chosen figure which is multiplied against the cash flow figure. The multiplier typically is obtained by looking at comparable sales of businesses, considering their net income (or earning capacity) and deriving the multiplier from the sales price and net income.

Here the Debtor, a small business that has only shown positive cash flow post-petition and in the prepetition period was showing losses. The Debtor will be making plan payments for 5 years. The Debtor believes that its going concern value is zero based on the facts that its ability to earn money will be devoted to costs of goods sold, expenses and plan payments during the 5 year period, that someone seeking to purchase an individually owned construction company would objectively be better starting a new company, rather than purchase Encompass which has had some negative social media and which will be paying plan obligations for 60 months. If valuation becomes an issue for confirmation, the Debtor will present relevant evidence at confirmation.

D. Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor. The attached financial reports show the Debtor's significant turnaround and its ability to conduct its affairs with positive net cash flow.

1. Ability to Initially Fund Plan

In the prepetition period, the Debtor was suffering financially. It lacked funds to continue and to complete construction projects. With the chapter 11 filing, the Debtor moved to reject some construction contracts, thereby freeing up resources. It also collected some monies owed. It focused on contracts that brought in monies so that the Debtor could work on the non-rejected contracts. The Debtor has increased the margin on its bids. It is employing a construction approach that places all workers on one job for a period of time instead of spreading out the workers into multiple work sites, this to generate revenues and to complete projects. Post-petition, the Debtor initially suffered from poor revenues but by spring, gross revenues had stabilized. Costs of goods sold, as a percentage, have been appropriate. The Debtor has enjoyed a positive net profit post-petition. The Debtor maintains funds on hand and should have the funds indicated in the projection on hand at the Effective Date.

2. Ability to Make Future Plan Payments And Operate Without a Further Reorganization.

The Debtor must also show that it will have enough cash over the life of the Plan to make the required Plan payments. The financial reports attached to this Disclosure Statement reflects a stable business. it has construction contracts, makes bids on new contracts regularly and expects to have a backlog of work into the future.

V.

INJUNCTIONS AND EXCULPATIONS

A. **Injunctions Concerning the Debtor**

*Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, any entity that has held, currently holds, or may hold a claim or Interests against Debtor is permanently enjoined from taking any of the following actions directly or indirectly against the Debtor, the Reorganized Debtor and its property on account of any such Claims, debts, liabilities, or Interests or rights:*

*(i) commencing or continuing, in any manner or in any place, any action or other proceeding that may impact the Order confirming the Plan or the reorganization;*

*(ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order that is in effect a judgment, award, decree or order against the Debtor or Reorganized Debtor;*

*(iii) creating, perfecting, or enforcing any lien or encumbrance against the Debtor, the Reorganized Debtor and/or their assets;*

*(iv) asserting a setoff, right of subrogation, or right of recoupment of any kind against any debt, liability, or obligation due to Debtor or Reorganized Debtor, accrued before the Effective Date of the Plan; and*

*(v) commencing or continuing any action in any manner, in any place that does not comply, or is inconsistent, with the provisions of this Plan or the Confirmation Order.*

B. Exculpations for Professionals of the Estate.

*The Debtor's professionals identified below in this section were retained in this case with the Court's approval. The Debtor's professionals (identified below) are exculpated from any cause of action for any claim that is related to this case, any act or omission in connection with, related to, or arising out of this case, any other act taken or omitted to be taken in connection with or in contemplation of this case, any act taken in connection with the administration of the case, and any act taken or omission regarding property to be distributed under the Plan. This provision shall only exculpate causes of action that take place between the Petition Date and the Effective Date and shall not shield any professional from claims of fraud.*

*Identified Professionals: The Fox Law Corporation, Inc.; RoganMillerZimmerman, PLLC; and Lucove & Say, Accountants.*

C. Temporary Post-Confirmation Injunction Protecting Injunction Beneficiaries.

*The proposed injunction is integral to the restructuring of the relationship between the Debtor and its creditors. 28 U.S.C. §157(b)(2)(L) During the Plan term, the Confirmation Order shall temporarily restrain any creditor, party-in-interest or any third party from pursuing Mr. Eugene Benton (the "injunction beneficiary") for collection of all or any portion of their Claims or any claim that could have or should have been brought against the Debtor. The temporary injunction shall restrain claims against the injunction beneficiary and his properties and assets but only for as long as Mr. Benton continues to manage the Debtor and its business.*

*Claims included within the injunction are those that arose prepetition or that arise through the Effective Date. The injunction shall terminate upon the conclusion of Plan payments to general unsecured creditors or at such other time as the Court may direct.*

*The injunction shall apply to any lawsuit that has been brought or which may be brought against any of the injunction beneficiaries as well as any collection or enforcement activities. The injunction is intended to stay actions that those entities in the following list have brought or which may bring on account of guaranties by Mr. Benton.*

*The Plan's success in large part relies in part on Mr. Benton leading the Debtor though the Plan payment period.*

*Litigation against Mr. Benton will be stayed in part on the basis that actions against him are really suits against the Debtor and entry of judgments in these actions could lead to the development of claims against the Debtor, claims that could result in factual findings being made in non-bankruptcy courts, that could be binding on the Debtor despite §1141 and its discharge.*

*Upon Confirmation of the Plan, all creditors and all third parties shall be temporarily enjoined, pursuant to 11 U.S.C. § 105, from proceeding against the injunction beneficiaries and their assets for the collection of all or any portion of their Claims. This temporary injunction will remain in effect during the Plan term.*

*Should the Debtor be in violation of the Plan's payment terms and if that violation remains uncured for a period of 30 days after receipt by the Debtor of written notice from any party directly affected by such violation, the affected party may apply to this Court to dissolve the temporary injunction only as to the moving party. As the issuing court, the Bankruptcy Court shall have exclusive jurisdiction to extinguish or modify the temporary injunction. The Debtor retains the right to file a motion to continue or to reinstate the temporary injunction.*

*The injunction is not a discharge or release. To the extent he may have any liability, Mr. Benton shall not be discharged or released from any liability for any claim and debt.*

*11 U.S.C. §105(a) permits the temporary injunction while plan payments are being made especially here where the injunction is an essential means to implement the Plan (§1123(a)(5)), the injunction is in the best interests of the estate, most if the creditors and equity interest holders, as it promotes feasibility.*

*The Confirmation Order shall constitute findings the Court possesses the jurisdiction to issue the injunction, the injunction is consistent with §§105, 524(e), 1123(a)(5), 1129 and 1141 and other Code provisions and that issuing the injunction is in the best interests of the Debtor and the estate.*

*Further argument and factual support for the issuance of a temporary injunction will be provided prior to the Confirmation hearing if necessary.*

# VI.

# EFFECT OF CONFIRMATION OF THE PLAN

A. Discharge of Debtor.

On the Effective Date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the Effective Date, to the extent specified in §1141. The discharge will not discharge any liability imposed by the Plan.

B. Vesting; Authority to Initiate and Maintain Adversary Actions.

Confirmation of the Plan vests all of the property of the estate in the Reorganized Debtor.

As of the Effective Date, the Reorganized Debtor shall stand in the shoes of the Debtor or Debtor's Estate as the party in interest in any litigation in which the Debtor or the Estate may be a party as of the Effective Date. The Reorganized Debtor shall have the sole authority to enforce, prosecute, defend, settle, or otherwise administer such litigation, lawsuits, contested matters, or adversary proceedings and any and all Causes of Action and Avoidance Actions.

All claims (as defined by the Bankruptcy Code), causes of action, suits, damages, and rights to payment or recovery of the Debtor or the estate of any kind or nature whatsoever are preserved and vested in the Reorganized Debtor. This includes, without limitation, all avoidance action claims against insiders or others, and any claims for contribution or indemnification for amounts paid or to be paid by the Debtor or Reorganized Debtor, as the case may be, on account of guaranty obligations.

The Court shall retain jurisdiction to the fullest extent permitted under the Bankruptcy Code and case law.

The failure to list any potential avoidance actions or other causes of action, generally or specifically, is not intended to limit the rights of the Reorganized Debtor to pursue such avoidance actions or other causes of action.

Unless an action is expressly waived, the Plan expressly reserves any avoidance actions or other causes of action for later adjudication. No preclusion doctrine shall apply. All avoidance actions are preserved under the Plan for the benefit of the estate.

The Reorganized Debtor shall be authorized under the Plan to bring objections to any Proof of Claim. Any resolution of such objections shall be subject to approval of the Bankruptcy Court.

C. Modifying the Plan.

Encompass may modify the Plan at any time before it is confirmed. However, the Court may require a new disclosure statement and/or re-voting on the Plan. The Debtor may seek to modify the Plan after the Court confirms the Plan but before substantial consummation has occurred. 11 U.S.C. §1127.

D. Non-Severability Clause

The Order on confirmation shall constitute a judicial determination that each term and provision of the Plan is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted without the Debtor's consent, and (3) non-severable and mutually dependent.

E. Release of Liens.

Upon full satisfaction of secured claims as provided for by the Plan, claimants possessing liens shall promptly file releases of their liens as to the Debtor regardless of whether these claimants may have been owed money by third parties. The failure to promptly release such liens shall constitute a violation of the Plan subjecting the offending claimant to damages.

As to recorded liens other than the FTL's, they do not attach to property in which the estate holds an interest. The confirmation order shall provide the following liens are entirely avoided and the filers of the liens must promptly record termination of their liens:

- Fox Funding
- Unique Funding Solutions
- Parkview Advance
- Specialty Capital, LLC
- Peninsula Funding Group

F. Retention of Jurisdiction.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan, including, but not limited to, jurisdiction to determine claims, to determine compensation of professionals, to determine issues related to assumption or rejection of executory contracts and leases, to oversee the performance of the Plan, to adjudicate matters under 11 U.S.C. §1141, to issue injunctions and to enter and implement orders as may be necessary to restrain interference by any Person with consummation or enforcement of the Plan; to resolve any cases, controversies, suits, disputes or Causes of Action with respect to the Plan, to enter orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, to consider any modifications of the Plan, the Debtor's

discharge, to determine any other matter not inconsistent with the Bankruptcy Code and to enter a final decree.

G. Conditions Precedent to Effective Date

The Debtor may elect to delay the Effective Date of the Plan if necessary to have sufficient funds on hand to pay claims and expenses required to be paid on the Effective Date. If the Debtor delays the Effective Date, then the Debtor shall serve a notice of the delayed Effective Date on creditors.

The Effective Date shall be 30 days after the entry of an order confirming the Plan. The Effective Date is shown as month 1 in the Debtor's Plan projection.

The Debtor may move up the Effective Date in its discretion. If the Debtor does so, it will provide notice of such to the creditor body.

H. Final Decree.

Once the estate has been fully administered, as provided in Rule 3022 of the F.R.B.P. and all professional administrative claims have been paid in full, the Debtor shall request a final decree to close the case.

## VII.

## RECOMMENDATION

The Debtor recommends that all creditors vote to accept the Plan. The Plan provides the best possible return to Creditors under the circumstances and a much greater return than if the Chapter 11 case is dismissed or converted to Chapter 7.

Dated: October 3, 2026

Encompass Enterprises, LLC

By /s/ Eugene Benton

Eugene Benton, Managing Member

Counsel for the Debtor:

THE FOX LAW CORPORATION, INC.

By /s/ Steven R. Fox

Steven R. Fox, CA SBN 138808

15455 San Fernando Mission Blvd, Suite 400

Mission Hills, CA 91345

(PH: (818) 774-3545

srfox@foxlaw.com

General Bankruptcy Counsel

ROGANMILLERZIMMERMAN, PLLC

By /s/ Christopher L. Rogan

Christopher L. Rogan, Esq. (MD 08365)

50 Catoctin Circle, NE, Ste 300

Leesburg, VA 20176

PH: (703) 777-8850

FAX: (703) 777-8850

crogan@rmzlawfirm.com

Local Counsel to Debtor